On the merits.

*485 1. The memorandum itself is a good will.
Signing is not necessary to a will oí personal estate. The animus testandi is all that the law requires. On that ground nuncupative wills were first established; and it is on that principle that we contend for the position just advanced.(a) The authorities cited expressly prove, that if a paper be in the hand-writing of the testator, purporting to be a disposition of his personal estate, or even if it be written by another pursuant to his instructions, and there be proof of those facts, it is a good will, though his name neither appear on the face of the instrument, nor be subscribed to it.(b) The animus testandi, in the present case, clearly appears. When the testator gave the memorandum to Ferguson, it was for the express purpose of drawing his will conformably to his instructions. The memorandum contained a reasonable disposition of his estate, and was intended to prevent the effect of the lapsed legacy, in consequence of the death of Thomas Nelson Cogbill. Again; the paper purports to be his last will: it appoints certain persons as executors of his last will, &c. which is full proof of his intention to devise; so that, if his name had appeared in any part of the instrument, it would have been a complete will to all intents and purposes.
Another reason for considering this paper as a good will, is, that the delivery, by the testator, to Ferguson, was a due publication. There is no technical form of publication. Any act which shews that the testator meant it to be hiswill, is sufficient. Toller, in the page just cited,(c) says, that the presence of witnesses to the publication of a will of personal estate is not essential to its validity. There is additional evidence that this paper contained the last, will and testament of John Cogbill; he told Archer, (another witness,) that Ferguson had written his will, with which he was perfectly satisfied; and Ferguson proves *486 that the will, as written, strictly conformed with the intentions of the testator declared in the memorandum. Even if a man writes his will, and locks it up in his scrutoire and no person sees it till after his death, still it is his will.
But, if this paper be not a will, it contains notes for a will; and that will be considered sufficient, even if the will be not afterwards approved of; for they are evidences of the testator’s mind. Richardson on Wills, p. 26. This authority is express, that if the notes be sensible and substantive, so as to be intelligible, they are a complete will. To the same point is Dyer, 72. pl. 2. Browne v. Sackville, 1 Anderson, 34. Swinb. on Wills, 6. Godolph. 14, 15. These authorities clearly prove, that, if notes only be taken for a will, they will amount to a complete disposition of the property, if they be reduced to form during the life-time of the testator. If notes taken by another be sufficient, how much stronger is the case, when they are made by the testator himself! The act of Assembly (a) has no influence on the case. It only prescribes the form of wills of real estate; but, as to personal, they are left as at common law.
2. If, however, the Court should be of a different opinion as to the points already made, the other cannot fail— that the new will written by Ferguson was a good will, and the memorandum is to be taken as a substitute, that will having been lost, (a) This will was approved by the testator, both in the presence of Ferguson and Archer; and his failure to sign it is sufficiently accounted for: he wished first to release a debt due from his brother’s estate, for the bexxefit of his representatives. Nor is there any evidence of a chaxxge of intention, either as to this will or the* memorandum.
The draught of the new will having been lost, the next best evidence which can be adduced ought to be adopted that is, the memorandum. If a bill in Chancery were brought to set up this lost will,- there cai'x be no doubt, on principle, but -it would be established. But we contexxd *487 that a Court of probate ought to receive it, and admit it, or a substitute, to record, whenever the Court can be satisfied that the substitute is a true representation of the original. The practice in England is, to receive proof oí a copy of a will made abroad, and to grant probate of it; although there is no act of parliament which says that a copy is sufficient. So, if a will be lost, (from whatever cause,) the Court of probate will receive a substitute, and admit it to record, (a)
But I presume it will be said, that Ferguson struct out some little expletives which he had inserted himself in the memorandum; on which circumstance an argument may be founded. To which it will be a sufficient answer, that if the will was good at the time of CogbilVs death, no act of Ferguson's could destroy its validity.
Hay, for the appellees,
(after stating the case, and animadverting with great severity on the conduct of Ferguson and Archer, in discovering such unusual activity in endeavouring to establish the memorandum as a codicil to the will of John Cogbill; in consulting counsel on it; in taking possession of the testator’s papers before his death, and withholding them from his executors; in the great tardiness manifested by Ferguson in preparing the release; in his altering the memorandum, after he had inserted certain words in it in the presence of Cogbill, which might technically be called a forgery ; and, finally, in his retaining the memorandum after he had written the draught of a new will,) proceeded to discuss the propositions of Mr. Call.
As to Mr. CalPs first point, that the memorandum is a good will; we say, that John Cogbill died without any other will than the first. Mr. Call, howxver, says that he left three.
The memorandum is not a good will, because John Cogbill did not intend this paper should be his will. This is a plain matter of fact, to be gathered from the evidence *488 of the witnesses, and the intention of the testator; and, if we can shew that Cogbill did not mean to make it his will, the Court will not admit it to record as such. John Cog-bill wrote a paper, and gave it to Ferguson, not as his will, but as a memorandum to write a.will by. Is there any principle of common sense which says, that a paper to draw a will by, is a will. If Mr. Call had viewed this case through that medium, and not through the spectacle of books, he would have been less confident of the truth of his first position.
But, says Mr. Call, mere notes for a will are sufficient. Admitting this to be true, it does not apply to the present; case ; for Ferguson says there was another paper, containing the oral instructions, which he afterwards reduced to writing; and the paper now produced does not contain all the instructions of Cogbill. Richardson on Wills (p. 26.) does not prove that mere notes for a will are a will itself. Dyer (p. 72.) is a confused case: it is referred to in Swinburne., Godolphin, Anderson, and other old books cited by Mr. Call, and the facts differently stated in nearly all of them. These .old books are but of little authority, and seldom cited in Westminster-Hall. In opposition to these cases, I will refer to Rowel on Devises, 27. 7 Bac. Abr. Gwil. edit. 317. tit. “ Wills,”&c. let.(p). div. 2. Richardson on Wills, 5. Swinb. 6. 521. and toller, 3. 57. (new edit.) all of which prove, that a will is an act of more solemnity than has been ascribed to it by Mr. Call; and, if it appear, that the testator contemplated a change in his will, or only left imperfect draughts for a will, it is not sufficient to constitute a will. In the case beforé us, Cogbill determined not to subscribe any will, until the release should be executed. Will the Court, then, say, that a particular paper shall be . his will, when he determined to make no will, until a certain occurrence should have taken place ?
Modern determinations with respect to wills, seem to be approaching the standard of common sense, much more nearly than the old. In Coles v. Trecothick,(a) and Mai *489 theius v. Warner,(a) it is held, that a paper, to be a good will, even, of personal estate, must be a complete definite rule or law for settling the estate of the testator: nothing must remain to be done» This last case seems to cut up, by the roots, all the old doctrines on this subject. The same idea is expressed by Lord Mansfield in the case of Right, &c. v. Price, (b) All these authorities go to shew, that, when the testator meant to do something more, and left the instrument incomplete, it ought not to be established as his will. In Roberts on the Statute of Frauds, 448. 453. there is much doctrine on this subject; all going to prove, that the former decisions establishing loose papers as wills, were exploded. Under the authority of this book, even if the lost will were here, it could not be considered the will of the testator. But, with respect to the memorandum, there can be no question. John Cogbill never intended it as his will. After he gave it to Ferguson, he never heard of it. Probably he thought Ferguson had destroyed it. Yet it is contended, that a paper which the testator never thought of as his will, shall be established as such! So far from recognizing this memorandum as his will, he never spoke of it: he always spoke of the draught as his will, which he was anxious to sign as soon as the release could be prepared.
Another circumstance is conclusive. In lieu of the memorandum, Cogbill had received the draught of a newwili from Ferguson. He intended to execute this as his will, upon the happening of a certain event: that event never happened. Would it not be monstrous to say, that that paper shall be his will, when he determined it never should be, till the release should be executed ?
If the testator intended this memorandum to be his will, (as contended for by Mr. Calif why did he not sign it at once ? The circumstance, that he named some executors, has no weight; because he obviously left the paper incomplete, concluding it with an et atiera, as if he intended to add something more.
*490 As to Mr. Call’s second proposition, that, the draught having been lost, the memorandum may be proved as a substitute, it is perfectly immaterial whether it be correct or notl The only question before the Court below, related to the memorandum. How can a question be presented to this Court as to the draught, unless it be in the shape of an original proposition ? This Court cannot take original cognizance of any case. It is a Court of appellate jurisdiction, not a Court of prohate; and can only say, whether the District Court did right or wrong, as to the question which was submitted. No precedent can be adduced, in .this country, where the substance of a will, which has been lost or destroyed, has been proved by witnesses, and entered of record. All that can be done is, for a Court of Equity to grant relief by setting up the lost will, if, from the circumstances, it should be proper. No argument is to be drawn from the laws of England, with respect to the probate of wills ; because they are so entirely dissimilar to those of this State. Our statute-book, throughout, contemplates the production of the original will, and not of a copy.(a) Even if the lost will were before a Court of probate, it could not be admitted to record, according to the principles laid down by Swinburne, p. 450. because it could not be proved by persons free from all exception. But neither the memorandum nor the draught is the will of John Cogbill, because he positively refused to execute the latter till a release should be prepared, and signed by him.
Randolph, on the same side.
The first position to be examined is, whether the memorandum be a good will. Secondly, whether, if not, the draught of a will, which has been lost, can be established by the instituting proof of the substance.
Thp law, though always rigid as to the disposition of land, was originally careless in bequests of personal property. But the Judges, of late, have established modes of proof far more guarded than formerly; and, in the lan *491 guage of Roberts,ft) we may say, “ that later determina- “ tions at Doctors’ Commons seem tending to establish a “ more discriminating doctrine.”(a)
As to the position, that the memorandum is a good will in itself, two preliminary remarks are necessary. First. It is not enough, in order to make this a good codicil in itself, that John Cogbill might generally have professed an intention of devising, as in that instrument; but the voluntas testandi must have existed in his mind quoad this particular paper.(b) The writer must intend the paper to stand as written.(c) Secondly. Parol evidence is admissible to shew whether that instrument should ever come into existence in that actual form. In the same case of Matthews v. Warner,(d) the counsel for the will admit, that, in ambiguous cases, it may be necessary to resort to evidence, not of intention and design, but of what the testator himself conceived he had done by that paper.
But we do not rely on parol evidence alone. There are internal evidences that the testator did not intend this paper to stand as his will. If that identical paper was not intended as the will of Cogbill, it is not in the power of the Court to make it so. When did he intend it as his will 1 Not when the original will was written by Ferguson, in whom he confided. If he had intended it as his complete will, would he not have perfected it by signing and publishing ? Would he not have made some disposition of the remainder of his estate, and said something as to the mortgage due from the estate of his brother Jesse Cogbill P This memorandum was not intended as a will, but only a projet of a will. It is incomplete — a blank left for executors — and concludes abruptly with an &c. His calling it a will is immaterial. The case of Matthews v. Warner furnishes much stronger ground, and yet the will was held not to be valid.
It is perfectly clear, that both Cogbill and Ferguson were acquainted with the mode of perfecting a will. Knowing that the memorandum was void as to real estate, it is a *492 fair presumption that they considered it void as to personal estate also. But it appears, from the evidence of Ferguson., that Cogbill did not consider this memorandum as a codicil. It was furnished to write a -will by, and was to form a part of his will when certain acts were done. His leading object -was to release the mortgage on the estate of his brother Jesse Cogbill. By examining the memorandum it will be found, that, if it be established as a codicil, that great object will be defeated. The testator had originally inserted words in the memorandum, which would have had nearly the effect intended of releasing the mortgage to Jesse Cogbill’s heirs. He afterwards erased them, in order to execute a release. His not having done so, shews that his intention is incompletely expressed. In none of the cases cited by Mr. Call is there this strong circumstance, that there was a condition annexed, without the performance of which the testator did not intend the paper to be his will.
In Shepherd’s Touchstone, p. 408. there is a case which establishes the principle for which I contend. There a notary was directed by the testator, to write a will of his land to J. S. with a condition; and the notary wrote the will to J. S. but the testator died before he could write the condition ; and the whole will was held to be void.
The memorandum, in the case before us, was declared by the testator as the basis of a new will. The witness explicitly states that he did not consider it a codicil, but only a memorandum, to write a new will by. Cogbill repeatedly declared that he would not sign the draught of a will, until he had previously signed the release. As an evidence of the estimation in which he held these papers, the original will was put in a trunk in a place of safety, but the draught was thrown into a closet. Death, by accident, often gives validity to a paper incomplete in itself; but it never makes a paper absolute, when it was not so intended by the testator till a certain condition should be performed. He concluded by referring to Roberts on the Stat. of Frauds, 33r. 453.
Wickham, in reply.
The argument of Mr. Randolph is founded on the assumption of a position which is the main subject of controversy between us. , He says, that the testator never intended the memorandum as the identical paper which should be his will. Admitted: but on all questions of wills of personal estate, the only inquiry is, whether the testator ¡intended to dispose of his property in a particular way. It is unimportant whether he expressed that intention on any particular paper. It is admitted, too, that there are strong prejudices against any disposition of an estate without the solemnity of writing.
Much has been said to impeach the credibility of two of the witnesses ; but they are more important to the appellees than to ourselves. Suppose we had exhibited this paper, and proved the hand-writing of the testator, could there have been any doubt but it would have been established as a good codicil, as to the personal estate f All that was wanting was that internal evidence which the paper itself affords. Reject the testimony of those two witnesses, and the will is proved beyond a doubt: it is proved by the evidence of other witnesses.
But, it is said, the paper is incomplete in itself; there is, an et emtera at the conclusion! So there are in many sections of Littleton: yet the law has always been considered as fully stated by him.
The signature of the testator is only necessary in wills of real estate. It is remarkable that all the laws respecting wills oí personal estate are merely prohibitory. In no instance do they enlarge the rights of the parties; but leave them as they stood before.
It is asked why Ferguson took the papers from the house oí CogbilP. Why should he not? It was the house of a bachelor; none but negroes were about it, and persons interested in destroying the papers. But why give them to Archer ? For the same reason which induced him to take them; to preserve them. Mr. Archer was a respectable .man, and a friend of the testator. But why consult coun *494 sel ? As the friend of orphans. Why should Ferguson attend the counsel ? For a very plain reason; that the counsel might know what he could prove. But, technically, Ferguson has been guilty of forgery ! He certainly shewed more delicacy than necessary, from a mistaken apprehension of the law. But in point of morality the act might be proper or not, according to the motives with which it was done.
But it is said to be strange that we should Contend that all those papers constitute one will! Why should we not ? If a man leave twenty testamentary papers relating to personal estate, all may be proved; and, as far as they are consistent, they shall stand. (a)
In considering this question, I shall rely upon what has before been stated by Mr. Call, that the animus testandi is all that is necessary. I shall inquire, not whether the ttestator meant this particular paper to be his will, but whether he, having the animus testandi, meant this disposition of his property. This paper is merely an evidence of his intentions. “ Non jus esse in tabulis«”
A will or testament is defined by Sir William Blackstone to be, “ the legal declaration of a man’s intentions, which “ he wills to be performed after his death.” The form of the will is the mere effect of positive institutions. The true inquiry is, whether it be the declaration of a will. This brings us to the question, what solemnities are required by law. All the authorities shew that a declaration is sufficient as to personal estate, whether further formalities were required or not; for utile per inutile non vitiatur; that which is good in itself shall not be rendered invalid by the omission of a circumstance which is unnecessary.
The case in Richardson, 26. is cited in 7 Bac. Abr, 338, 339. Gwil. edit, and is an express authority in our favour. Dyer, and Godolphin, and Swinburne, are said to be old books of litde authority in Westminster-Hall; that the case in Dyer is confused; and that Godolphin and Swinburne copy from him. Dyer is a book of great authority; so much so, that it is quoted in almost every page of Ld. Coke. There is a *495 peculiar propriety in going back to the old authorities for an exposition of the law with respect to wills of personal estate; because, since the statute of frauds requiring certain requisites in the disposition of lands by will, almost every question turns upon those circumstances. Powell has been referred to, to shew that Dyer has been overruled; but, if we look at Powell, p. 26, 27. we shall find that the authority of Dyer has not been denied; two anonymous cases from Leonard are indeed contradicted by the cases of Nash v. Edmunds,(a) and William v. Edmunds;(b) but this was because the cases in Leonard related to lands, and the testator had given no directions about writing his will: his words were officiously committed to writing without his authority. Mr. Hay refers to 7 Bac. Abr. Gwil. edit. 317. as an authority in point. This case is stated more fully in 8 Vin. Abr. 118, 119. pl. 16. as in MS. under the name of Bartlett v. Ramdsden ; but it has no application to the case before the Court: it went entirely on the distinction that the testator, after drawing up his own will, sent it to counsel to be advised of the legality of it; but, not having published it after receiving it back, it was held to be no will. But if it had been sent, with directions to write or copy it, it would have been a good will. Ln that case, the will was drawn for the consideration of counsel; in this, it was drawn after counsel had been consulted. The next authority referred to by Mr. Hay, is Swinburne, page 6. figure (14). If he had read a little further, he would have seen , that, for the most part, testaments, so far as they are perfected, are good. Iiow often does it happen, that a will, though not good as to real estate, when the testator meant to do something more, yet is good a.s to personal. In page 521. of Swinburne, Mr. Llay says there is an authority in his favour. How is this authority to be understood? Clearly as a draught for future consideration, as will appearfrom perusingthe next preceding page, 519. figures (9) and (10). Great reliance is placed on the circumstance that Cogbill did not intend to sign his will, until the release could be prepared and executed. No doubt he intended a fe *496 lease : but for whom ? Not for the persons now before the Court, but for the descendants of Jesse Cogbill.
But the verbal directions respecting the outstanding debts, are not inserted in the will! What does this prove ? take it either way. It might be proyed now in the Court of Chesterfield. By affirming the decree of that Court, it does not preclude the parties interested from proving that fact. That disposition may well consist with the one made by the paper written by Ferguson.
But the testator intended some further formalities! and the omission of them, it is said, destroys the will. That is the very point upon which we are at issue. While we admit that he did; yet all the authorities are against the position contended for on the other side. Toller, page 3. and Roberts on Frauds, page 405. are cited and relied on. While it will readily be admitted that those are authors of great talents, yet no person will say that their mere opinions are authorities. Whatever doctrines are to be found on this point in .those writers are inferences and erroneous inferences from the authorities cited by them. The doctrine to be found in page 3. of the new edition of Toller, is not inserted in the first. Probably he copied it into the second edition, from Roberts; they both cite the same cases, all of which are referred to in Limbery v. Mason,(a) and support the doctrines for which we contend. The passage in Roberts relied on by Mr. Hay, contains merely the author’s opinions. Cases are said to have been decided, but when, or where is not shewn, nor are any of the circumstances stated. In a subsequent page of the same writer, (p. 453.) if his book be considered as an authority, the doctrine for which we contend is expressly recognized. The case of Coles v. Trecothick,(b) turns wholly upon the question whether, in that case, there should be a specific performance of an agreement. Not a word about a will exists in the whole case; and yet a mere dictum thrown out by the Judge by way of illustration, in a case to which it had no reference, has be,en quoted as a point decided in the cause.
*497 I come now to the only authority which seems, in any point, to support the doctrines contended for on the other side; the case of Matthews v. Warner.(a) If that case be taken altogether, I would not wish a stronger one in our favour. It shews that Roberts had totally misapprehended the law on the subject. There are three points in which that case differs wholly from this : 1st. It was only the plan of a will, and so indorsed by the testator; and he never did give the plan to any person to write a will by: 2dly. Four years afterwards, he wrote a different paper, abrogating all former wills: 3dly. There was parol evidence, witness after witness, to prove that he had changed his intentions; and one witness proved that he had seen a subsequent will to this, making a different disposition of his estate. But is that the case with us? No. If such a will as the one now before this Court, had been the subject of controversy in that case, can there be any doubt but it would have been considered a good will ?
The case of Right v. Price,(b) has no application to this. That case only decided the point, that there must be a mental as well as a corporeal presence.
The memorandum, it is understood, is alone to be considered before this Court; but we contend that the parties will not be barred from producing the draught to Chesterfield Court, hereafter, and proving it; and, as far as that shall be consistent with the memorandum, both shall stand. This is the most authentic paper, because it is the will of fohn Cogbill written with his own hand.
But we are told that we must resort to a Court of Equity to set up the lost will; that our Court of Probate has no jurisdiction, except under the act of Assembly, which speaks of the original will only; but it has jurisdiction of matters testamentary generally. Our Court of Chancery has no jurisdiction but under the act of Assembly; and that gives it jurisdiction in all matters of equity. So that both amount to the same thing. In the case of Bransby v. Keridge,(c) it is expressly said that a Court of Chancery in England has no jurisdiction of matters testamentary.
*498 As to Mr. Randolphs argument that Cogbill was so intent upon the release that he never would sign his will until that was executed, making the one condition dependent upon the other; the answer is, that the only misfortune to us, is that he did not execute the release.
Here was a continuing intention on the part of Cogbill to dispose of his estate as expressed in this memorandum; which is a strong circumstance in our favour. The cases cited by Mr. Randolph of a non-continuing intention have no application.
Thursday, June 2. The Judges delivered their opinions,
Judge Tucker.
John Cogbill made his will duly executed ; but on the death of T. N. Cogbill, one of his principal devisees and legatees therein, he gave that will, with a memorandum all written in his own hand, but without his name in any part of it, and without date, and concluding, in these words, “ lastly, I do nominate and appoint Capt. Charles Graves, Jlrmistead Hill, and ——-, executors of my last will,” &c. to James Ferguson to write a new will by, In this memorandum there is a razure, hy which it appears, that at the time of writing the memorandum, he had given all his outstanding debts with the residue of his estate to S, N, Cogbill, the daughter of T. H. Cogbill, in whose favour a similar bequest had been, made in his first will, Ferguson swears that this razure was made by Cogbill, before he received the memorandum from him, and that he verbally directed him, that the outstanding debts before bequeathed to Cogbill should go to Armistead Hill, He likewise swore (as I understood him) that he prepared a will agreeably to CogbilPs instructions, that-is to say, comprising all the legacies contained in the first will, (except the one to T. N. Cogbill, who was now dead,) those in the written memorandum prepared in CogbilPs own hand-Writing, and the verbal directions respecting the outstanding debts, of which he says he took a memorandum in writing, in CogbilPs presence, That he deliver* *499 ed the draught of the will to Cogbill, who read.it over more than once, as he believes, and approved of it; but did not sign it, as he wished to release his brother Jesse CogbilPs ©state from a considerable debt due by mortgage, and requested Ferguson to prepare a release for that purpose, on a separate paper, which he would execute, and then sign his will. Ferguson prepared a rough draft of a release, and shewed it to Cogbill, but being interlined, Cogbill requested him to copy it over again, which he did. From the time of receiving the instructions to that of CogbilPs death was several months ; and the draught of the will was prepared and delivered to him about two months before that event: about a fortnight preceding it, Ferguson called at his house, when Cogbill asked if he had finished thes release. Ferguson said that he had not 5 Cogbill then said he wished he would, as he was anxious to sign his will. In his last illness he sent to Ferguson for the release; he went to his house, but found him in a delirious state, and incapable of executing the release, or the will s and he died without doing either. On further examination Ferguson said, that in writing the will he pursued the words of the memorandum verbatim, as far as they went. That where Cogbill was ill, finding his papers lying about in an insecure manner, he took the first will, and the draught of the second, and gave them to Mr. Archer to take cate of, that Cogbill might execute the will if he should get well enough to do it. That Archer returned the papers to him after CogbilPs death, and then he delivered them to Mr. MlRae to be exhibited in Chesterfield Court, where the witness saw them, and was examined respecting them. That he has never seen them since, and understands the draught is lost; that the memorandum in CogbilPs handwriting was never out of his possession until CogbilPs death. Mr. MiRae confirms the production of the draught at Chesterfield Court, and says that he understands it has since been lost; being thrown about, and thought of no consequence. The County Court established the first will, and admitted the memorandam in CogbilPs hand-writing *500 to record, as a codicil to it; but paid no regard, as far as appears, to the draught prepared by Ferguson. On an appeal to the District Court, as to so much of the proceedings in the County Court, as related to the memorandum, admitted to record as a codicil, that Court reversed the order of the County Court, and rejected the paper as a codicil; from this there is an appeal to this Court.
This cause has been very elaborately argued on both sides, and the reasons both for and against the judgment, of the District Court are so strong, that I have found myself at a loss to decide which ought to preponderate. That this memorandum wholly written by the deceased in his deliberate moments, is an evidence of his intention to dispose of his estate, in the manner therein mentioned, cannot be doubted. But that it does not amount to such evidence as the law requires to effectuate the testator’s intention is fully manifest from this circumstance, that although it expresses an intention to dispose of the lands therein mentioned, yet not being signed by him, it does not furnish that conclusive evidence of such intention which the law will not dispense with. But it is said, though not effectual as a devise of lands, it is perfect and complete as a will of personal property. I am not altogether certain of that; being without name, or date, and in part erased, and even unfinished, it could not be established without the aid of parol testimony, not only as to the hand-writing, but as to the subject of which it speaks. Suppose, for example, tire testator had not any slaves of the same names with those mentioned in this paper; if this were proved to the Court, would they consider it as his will, or that of some other person for whom he had been requested to prepare one. Parol testimony and circuArstances must be resorted to, to satisfy the mind of a Court, that a paper in this form is the last will and testament of any person whatsoever; even of him, in whose hand-writing it is found. If then the paper •needs .the aid of parol testimony and circumstances to sup *501 port it, may it not also be defeated by evidence of the same kind? The evidence, in the present case, is not that the deceased John Coghill shewed this paper to Ferguson as his will, or delivered it to him for safe keeping as such ; but that he delivered it to him accompanied by another paper, and verbal instructions, as a memorandum, from which to draw a will, which the testator, at the time of giving these instructions meant to execute as his will; but which when, prepared, and shewn to him, and perused by him, he did not execute. He certainly, when he delivered this paper to Ferguson did not mean it to be a codicil to his former will; but it was given as a memorandum, or instruction only, by which to prepare another will as to that part of his estate therein mentioned. It was not a whole, but a part only of a project of a will to be prepared; he did not give authenticity to it, as his will, but as the ground-work, upon which a more formal paper, containing a variety of other provisions, should be prepared, in order to be thereafter executed by him with all due solemnities. This paper then at the time he delivered it to Ferguson, was not his will, nor a codicil to his former will; but something else. It matters not, I conceive, by what other name, or description it is called, if it were not one or the other of these, at the time of the delivery thereof to Ferguson. Its effect as either must depend upon what it was at that moment. That it was of no importance in the eyes of Mr. Coghill, appears from this, that Ferguson never returned it to him so long as he lived. He gave him his former will, and the draught which he had prepared for a new one. Coghill seems to have thought no more about it. It was a perfect derelict; CogbilPs attention never was turned to it after he received the draught; but his attention was engrossed by the desire of executing that after he should have done an act, which if not done before the execution of the will, must operate as a revocation of it in part. He had resolved upon this act (as would seem from Ferguson's memorandum, though I lay no stress upon it, as he *502 was not particularly interrogated upon that point) after Ferguson received his instructions from him respecting the mortgage debt, due from his brother’s estate. His anxiety to execute the release, and to sign his will as prepared by Ferguson, manifest a conviction in his own mind thathe had done nothing since the death of Thomas Nelson Cogbill, which did, or could amount to a disposition of the property formerly devised and bequeathed to him. I rely on this circumstance to prove that he died intestate as to that property ; unless his approbation of the draught which Ferguson had prepared by his direction should amount to a publication of that will: but that question is not now before us; I shall, therefore, say no more concerning it.
Upon the whole, I am of opinion that the paper now before the Court was not prepared or intended by Mr. Cog-bill as a will, of itself, or as a codicil to his former will; nor was it delivered by him' to Ferguson to keep, as either the one or the other: consequently that it never received from him any authentic character, which might in any event denominate it a testamentary paper, and that the judgment of the District Court be affirmed. In dissenting from the opinions of the majority of the Court, I. feel that degree of distrust of my own, which nothing but a sense of duty could overcome.
Judge Roane.
On the 9th of November, 1805, John Cogbill made his last will and testament, duly executed before six witnesses. He therein gives to Sally Hill, daughter of his brother Jesse Cogbill, seven negroes, some horses and cattle, and a bed and furniture. He gives to. his nephew Thomas Nelson Cogbill, son of his brother Jesse Cogbill, the plantation on which he lived, 15 negroes, 5 horses, 23 cattle, 10 sheep, all his stock of hogs, household and kitchen furniture, (except the bed given to Sally Hill,) plantation utensils, all his outstanding debts, and all the remainder of his estate both real and personal; his said nephew paying all his just debts. In the event of his said. *503 niece and nephew dying without issue of their bodies lawfully begotten, he gives these interests over to Jesse Cog-bill and John Cogbill, (sons of his brother George Cogbill,) as may be particularly seen by reference to the will itself, James Ferguson is a witness to, and was, probably, the drawer of this will; and seems to have been privy to, and consulted on, the affairs of the testator throughout. Thomas N. Cogbill, Armistead Hill, (the husband of Sally Hill?) and Charles Graves, are appointed executors.
Thomas N. Cogbill having died some time after, and the dispositions to him being, of course, at an end, the testator contemplated a change in his will. His intentions on this subject were stated orally to, and committed to writing by, Ferguson, upon a paper now produced, with a view of consulting Mr. Gregory, (a lawyer,) touching the legality-of the limitations therein contained. The paper is very rough and imperfect; but the disposition purported therein is in substance as follows. He lends to Sally Cogbill, widow of Thomas N. Cogbill, the plantation, negroes, stock, furniture, and plantation utensils before given to Thomas N. Cogbill, during her widowhood, and “ after the death” of Sally Cogbill, widow, &c. he gives to her daughter, Sally N. Cogbill, the interests aforesaid. He gives to Sally Hill, 7 negroes, 2 horses, all his outstanding debts, except the deed of trust of his brother Jesse Cogbill, and the remainder of his cattle. He also gives her, in case she has a living heir, one half of the trust deed aforesaid, and the other half thereof to Sally N. Cogbill, his grand-niece, with proviso that she shall also have the other half, in the event of Sally Hill’s dying without living issue ; and, in case of Sally N. Cogbill’s death without lawful issue, then her mother to have the whole, and Armistead Hill to pay his debts, out of the legacy given to his wife. Charles Graves., Sally Cogbill; and Armistead Hill, are named, in this paper, as his executors.
On this paper is an indorsement, by Ferguson, (at what time made is not particularly shewn,) that a release was to be prepared in favour of Jesse Cogbil’s heirs, for the *504 amount of the deed of trust; and that, in the will to be written by him for the testator, the clause respecting the deed of trust was to be omitted.
After the writing of this paper, and about 7 or 8 months before the death of the testator, he delivered to Ferguson, his will of November, 1805 aforesaid, and the memorandum or paper which is now in question to write a will by.
That memorandum, die subject of the present controversy, is without date or signature, but is wholly in the hand-writing of the testator, and sensibly and fairly written, except as to an obliteration hereafter more particularly noticed.
In it he lends to Sally Cogbill., as long as she remains Thomas Nelson CogbilPs widow, the plantation, negroes, stock, furniture, and plantation utensils, before given to him. He then gives to Sally Nelson Cogbill, (the daughter of Thomas Nelson Cogbill and Sally Cogbill,) and her heirs and assigns forever, (and in case of her dying without issue of' her body, lawfully begotten,) to her mother and Sally Hill, equally to be divided, all the interests afore-’ said. In the draught of this paper, after the specification of those interests, diese words, “ together with all my out- “ standing debts, and all and every remainder of my estate, “ both real and personal, of every kind whatsoever,” had been added and obliterated, by drawing a pen through them. Two expletory words, entirely unimportant to the sense, were also interlined by Ferguson, with the assent of John Cogbill, and afterwards erased by Ferguson, for sonic reason which cannot affect the question now before us. The conclusion of this paper is in these words : “ Lastly, “ I do nominate Capt. Charles Graves, Armistead Hill, and “--, executors to this my last will,” &c.
It is evident that tha first paper, written by Ferguson, as aforesaid, was intended as a rough sketch of the whole will of the testator, comprehending the codicil made necessary by Thomas Nelson CogbilPs death; and that the last paper, (the one now in question,) was merely intended as a supplement to the will; by which, together with the ori *505 ginal will of November, 1803, the draught, herein after more particularly noticed, was to be made.
I have deemed it proper to state, thus particularly, the general contents of these several papers, to shew that Sally Hill and Thomas Nelson Cogbill, and, after Thomas Nelson CogbilPs death, his wife and daughter, were always the principal objects of the testator’s bounty; and that whatever fluctuations arose in his mind, after the death of Thomas Nelson Cogbill, respecting the outstanding debts, and principally the important debt due from his brother Jesse Cog-bill, it was his uniform intention, not only to continue to the daughter of Thomas Nelson Cogbill, the general provision intended for her father, but also to give that debt, in some shape, to these the objects of his preference: to speak more particularly, it was his intention at the time of giving the oral instructions to Ferguson, (which were by him reduced to writing, as aforesaid,) to give all his outstanding debts, and a moiety of the trust-deed debt, to his niece Sally Hill, her husband paying all his debts; and the other moiety of the trust-debt, aforesaid, to his grand niece Sally Nelson Cogbill, (the daughter of Thomas Nelson Cogbill,) with remainder over, &c. This intention, (as far as it relates to that trust debt,) was not abandoned by him up to the time of his death, as appears by the testimony in the cause; but he intended to effectuate it in another form, viz. by a release : his intention as to his other outstanding debts, (which were probably not considerable,) was indeed not kept up in the paper or memorandum now in question, nor is it proved that they were then intended to be bequeathed to any person.
When we consider the changes which, from a variety of causes, generally take place in the minds of testators, respecting the disposal of their estates, up to the time of their deaths, it will rather excite admiration that the intentions of this testator were so steadily retained for a long course of time, than that, in this trivial particular, they were altered: and it is certainly a strong circumstance, in *506 determining upon the validity of a will, that the provisions thereof are not only in unison with all the testator’s subsequent as well as previous testamentary papers, but also with his uniform wishes and declarations upon the subject.
In the present case the complaint is, not that the testator meant (by signing a release) to vary the disposition of his estate made by this paper, as far as it goes, with reference to his uniformly avowed intention; but that he did not also bequeath away a further interest, which he had certainly before intended to give to the present appellants ; that he did not execute another codicil, which he intended to execute in the form of a release, disposing of an interest omitted to be bequeathed in this, and which, from the testimony, he certainly intended for the appellants; and that, whereas he had before intended to bequeath to ihe?n the residue of his outstanding debts, he had changed his intention in relation thereto in favour of the appellees, by (quoad hoc) dying intestate. These are complaints which come with a very ill grace from the appellees : the appellants, on the other hand, may justly claim that the will of the testator may be permitted to operate as far as it is perfected, while they have cause to regret, that for want of a due execution of the paper in question, (or its counterpart, the will prepared by Ferguson,) according to our statute, they have lost the land certainly intended for them, as also the trust debt in question, for want of the intended execution of the release in their fayour, as aforesaid.
In determining the character of the paper in question, it will be necessary to have a very particular reference to the whole context and phraseology thereof. It will be found to be a very well-drawn codicil, with perhaps more form than is usual, and was even competent to have passed the lands thereby devised, had it been duly signed and published by the testator. It is of no importance that it wants a preamble, or has a blank left for the name of an executor. This last circumstance probably arose from the testator’s *507 ¿lot having definitively concluded, at that time, what person to substitute as an executor in lieu of Thomas Nelson Cog-¿ill, then deceased. The word “ lastly,” too, in the conelusion of the paper, denotes that the intentions of the testator, with relation to the subjects of that paper, were final; and the “ et cestera,” which concludes the paper, is undoubtedly in lieu of mere formal and supererogatory Words, declaring all former wills, conflicting with it, to be revoked, &c. Unless it is contended that no will can be established which has an interlineation, erasure or obliteration in it, I presume that the before mentioned obliteration, in this case, touching the outstanding debts, (and which, it is proved, was made before it was delivered to Ferguson to write a will by,) cannot be objected; and the two unimportant and expletory words, (now erased,) were added by the express desire of the testator, and are, therefore, as if they had been written by him. The subsequent act of Ferguson in erasing those words from the paper, certainly cannot affect the question before Us.
This paper, thus adequate per se, at the time, to pass the personal estate, as a codicil, and wanting only a signature to become competent to pass the land; this paper, containing the final settlement of the testator’s mind, touching the disposition of the interests therein devised and bequeathed; thus corrected by the obliteration aforesaid, respecting the outstanding debts, the most important part whereof, it is proved, (and thus the obliteration is well accounted for,) he meant to bequeath to the same legatees fey a subsequent release or codicil; this paper, which the testator erroneously supposed, or supposed through abundant caution, wanted form, was delivered to his friend Ferguson to receive that form, from his pen. It would have been a happy circumstance, (so far as it is desirable that the will of testators respecting the disposition of their property, should, unhesitatingly, be suffered to take effect; so far as it is highly to be desired that litigation should be prevented and avoided,) if* instead of this unnecessaiy *508 step, (the having it condensed with the original will and cast into form,) the testator had signed the paper in question, and deposited it in his desk; ©r, if you please, in that trunk, or closet, in which its counterpart was found at the time of his death.
This paper was delivered to Ferguson, together with the executed will of November, 180S; thereby appreciating the character of the former paper by the dignity of the latter. The two papers were delivered to Ferguson to “ draw a “ will byor, in other words, to throw the whole into what was deemed by him a proper form; and the paper-now in question was written by the testator, (who had applied to Ferguson to write his will for him,) in consequence of Ferguson’s telling him it would be best, in order to prevent mistakes, “ to put his wishes upon the subject “ into writing.” The paper was not, therefore, a mere plan ox projet of a will, depending upon the unsettled will or caprice of the writer, but contained his deliberate and settled intention respecting the disposition of his estate. It was not thrown aside, (as was the case of the paper in question in Warner and Matthews, a case to be more particularly noticed hereafter,) among useless and ordinary papers, but was delivered to his most confidential friend, together with another (perhaps his most important) paper, for the purpose of being cast into form ; and although the very paper now in question was permitted by the testator to be retained by this friend, after the draught of the will was rendered to him by Ferguson, (undoubtedly because he expected, that, by executing the draught, the original would become of no consequence,) yet his appreciation of that original may be estimated by his appreciation of its counterpart, which he deposited in, perhaps, one of the most secure places he possessed. It is certain that, on this ground, as well as on that of its final character, (as far as it goes,) this paper will stand a very advantageous comparison with the cases of notes for wills, with which the books abound; as will be, hereafter, more particularly noticed. *509 These papers were delivered, to Ferguson “ to draw a will ££ byand «although he says that he did not consider the paper as a will, “ but only as a memorandum to write a S£ will by(an opinion taken up by the witness, not only from the popular acceptation upon this subject, but because the paper, embracing also lands, and not being executed according to the statute, was, as to them, in truth, ■no will/) it is evident, from the whole tenor of his testimony, that he thought himself as little at liberty, in the draught of the will which he made, to depart from this paper as from the original will itself. He tells us, that that draught was (I presume with the exception of form) a verbatim copy of the two papers; and Mr. M‘Rae also tells us, he had compared them together and found them to agree, but cannot say that this agreement was entirely verbatim. This exact correspondence shews, in a strong point of view, the sense of this witness, (the drawer,) touching the character of this paper, and that, although he did not consider it as “ the will” of the testator, for the reasons just assigned, that it nevertheless contained his final wishes respecting the disposition of his property, as far as it went. The testimony of Archer is also very strong in relation to the testator’s satisfaction with the draughted will, which is a substantial, and perhaps even a literal counterpart of the paper in question. It is to be regretted, that Ferguson did not, in due time, render to the testator a fair copy of the release requested; for then the draughted will would have been signed, in relation to the whole property therein devised and bequeathed, and the release would also have operated as a codicil, in respect of entirely another interest; and thus the whole intention of the testator would have been accomplished. It is evident, however, that, although the testator wished to execute the two papers at the same time, (not expecting to be surprised by death in the mean time, he being proved to have been in good health,) the former was not at all dependent upon the latter, nor was the execution of the latter *510 a necessary condition upon which the execution of the former was to turn. They were entirely independent and distinct transactions, and related to separate and distinct interests. This wish of the testator to sign both papers at the .same time, well accounts, however, for the delay in signing the draughted will, up to the time of his death; and thus, in aid of the other abundant testimony in the cause, powerfully repels the presumption of a change of intention, generally inferable from a long delay in signing a will after it has been prepared. With respect to wills, perseverance, rather than mutation of intention, is the general principle: a long delay of signature, however, is, in general, a circumstance from which to argue a change of intention: but, when that delay is well accounted for, (as in this case,) the general principle remains unshaken, and, in making a construction, will have its effect.
I will now have a more particular reference to a few authorities touching the question before us.
This paper, or codicil, as relative to the disposal of lands, is justly abandoned by the counsel for the appellants. A will of lands is different from a will of personal estate : it must be executed according to the directions of the statute, being considered as a statutory mode of conveyance.(a) With respect to a will of lands, therefore, the identity of the paper, with reference to its actual execution as a will, is important, and the very paper exhibited as the will of the testator must have been executed by him, as and for his last will and testament. Even in this case, however, it is not essential that the paper established should be the identical one intended for his last will; nothing being more clear than that a will of lands duly executed remains in force until revoked by another will also duly executed: an approbation of, and intention to execute another will, is not sufficient.
A testament of personal goods, however, is said to stand upon a different foundation. A testament is defined to be, “ the legal declaration of a party’s intentions, which he “ wills to be performed after his death.”(b) In ascertain *511 ing the “ legality” of this declaration, we have reference to no statute, but to the principles of the civil law as recognized and adopted, touching this subject, in this country and in Englund.(a) In ascertaining what is the will of a testator touching his personal estate, we have recourse to no formulae of any act or statute, but to the just and fair construction of the document exhibited as containing it, under all its concomitant circumstances, as far as they can legally and properly be given in evidence, and as regulated by well-established decisions upon the subject. The only desiderata on occasions of this sort, are, that the intention of the testator be settled and final, as far as it goes, and, (in order to avoid peijuries, and the misconceptions of witnesses,) that that intention be declared by a writing made or adopted by the testator. This doctrine of our law finds a strong analogy in the policy adopted by the act of frauds in relation to other cases. Thus far, to prevent these mischiefs, the rule of decision ought to go; but there is no necessity to extend it any further. To extend the caution any further, while it is not required by any statute, would unnecessarily, (with reference to the reason of the rule,) operate as an abridgment of the right of disposition guarantied to every citizen. A case, (to be presently noticed,) on the grounds of decision in relation to notes for a will, contained under initial letters and unfinished words only, will exhibit an excellent commentary upon this distinction.
The decisions upon this subject inform us, that a testament, though not signed by the testator, and although written by another person, if according to his directions and approved by him, is binding, and this although no witnesses are present at its publication.(b) As to the identity of the paper, with reference to the pne intended to be the last executed, the numerous cases in "which notes for wills have been established, shew that to be unimportant. Upon this point of identity, I conceive there is no difference between a devise of lands and a will of personal estate. *512 Whilej in both cases, it is necessary that the will submitted to the Court be executed, or adopted, as the case may be, according to the law as applying to the different instruments, (that is, that the former be signed, or executed, pursuant to the statute, while the latter need only be sanctioned as the will, and be evidenced by writing,) it is not necessary, in either case, that the will submitted was the last that was intended to be executed. In both cases, the will submitted is to prevail, unless a posterior will was not only contemplated, but actually executed, prout the different laws relating to the several subjects. In the case of a will of personalty, such a will remains in force, (under our statute,) until legally revoked by another will in writing, conforming in other respects to the law as established on the subject. The question is, therefore, not whether the will submitted for probate is the last will the testator intended to execute, but whether, being once sanctioned as a will, it has been nullified by any subsequent act or testament.
With respect to the draughted will, now lost, but which is proved to have been totidem verbis, with the codicil in question, that paper is proved also to have received the sanction of the testator. In sanctioning that paper, if precisely agreeing with this, the testator also sanctioned this paper, as and for his will and testament; and, e converso, the reception of this will equally sanction that, if it shall ever be produced, and were in fact, as it is described to have been, by the witnesses.' The codicil now before us, standing by itself, is amply sufficient, and is no how impugned but by the testimony of witnesses: but that testimony must be taken altogether: and so taken, that will, as now understood, was no revocation of this codicil j but only a duplicate or republication of it. I shall presently have occasion to cite some authorities which establish this position beyond all controversy. But that will is not now before us, sitting as a Court of Probate; and however admissible it may be to receive testimony respecting its con *513 tents, in order to fortify this will, by shewing that the disposition purported by this will, continued to be that intended by the testator, even up to the time of his death, it is certainly irregular to resort to such testimony, (even li it were entirely different from what it is,) to overthrow the will before us; thereby invading the province of another forum, (the Chancery, to whom it belongs to set up that trill as a lost will, and, in that proceeding, to estimate the credibility and weight of the testimony respecting its contents ;) and of this forum, (the Court of Probate,) if the xvill itself shall ever hereafter be produced.
Referring, particularly, to the cases cited in the argument in which notes for wills have been established, and in which this objection respecting identity certainly existed, and did not prevail; I will briefly cite a few authorities on the subject.
In 7 Bac. Abr. 338. it is held, that where A. being ill desired B. to make her will, who wrote down only names and initial letters to this effect, viz. “ To Tho. West, 200l. “ to Jo. Dev. 100l, to Rob. Cro. 50l.” &c. which being more than her estate amounted to, B. made an alteration in the second column, by subtracting parts of the sums bequeathed, and then told A. the sense of the proposed devises, and A. was heard to declare that “ all was well,” thereby indicating her satisfaction therewith; B. went to a scrivener to have the devises drawn out at length, and in form, and, before he returned, the testatrix died; the Judge below pronounced in favour of this will; but, upon appeal to the delegates, the decision was reversed. It was reversed, however, only on the ground, that the bequests not being written at length, the will was not substantive in itself, but to take its sense from the interpretation of the witnesses ; that it was, in effect, a nuncupative will, and, as such, not having the requisite number of witnesses, was void. The ground of this reversal proves the truth of the doctrine I contend for. If the imperfect notes for a will in this case had been written at length so as to obviate the objection of *514 danger of perjury, and of mistakes arising from the mislaterpretation' of the witnesses, no objection on account of form, or of its not being the the identical paper intended to have been ultimately signed as the will, would have prevailed.
In the case of Habberfield v. Browning, cited in 4 Vesey, jun. 200. and also in Roberts on Frauds, p. 451. where a woman having considerable real and personal paoperty, wrote a very ignorant letter to her attorney, giving him an account how she would dispose of her estate, and added, “ Please not to put this rigmaroll in till I send it correct; “ this only by way of memorandum, in case I should go off “ suddenlyshe lived three or four months after, but took no further steps relating thereto: the Court of Delegates reversed the sentence of Sir George Hay, rejecting this will, and established it. It was established, although it was objected that this was only a conditional paper, depend* ing on the testatrix’s “ going off suddenly,” and although a change of intention might be inferable, (and was not rebutted by counter-testimony,) from the lapse of time between the writing of the letter and the death of the writer.
If not bound down by the established law on this subject, I might myself perhaps have boggled a little at these decisions: but I do not find that they have been overruled; and they certainly very far outgo the case at bar; not only in dispensing with form, but' in admitting to probate as wills, writings far less final and perfect than the paper before us.
I infer, therefore, incontestably, that there may be a “ legal declaration of a person’s intentions respecting what “ he wills to be performed touching the disposition of his “ goods after his death,” notwithstanding the paper containing such declaration was neither written by himself, nor is the very paper he intended in future to execute or adopt as his will, and which he would probably have executed, had not a premature death prevented. All that is requisite is, (and, here, the maxim, “ non jus esse in tabulis,” seems *515 to apply,) that his zvill touching the subject be settled, and that it be declared by a writing made by him, or with his consent and by his direction.
The case of Matthews v. Warner, 4 Ves. 187. has been relied upon, in opposition to the probate of this paper. In that case, the paper in question was indorsed and entitled} a “ plan for a- willwhence might be inferred that it was a mere projet; it was not delivered to any friend or scrivener, to be cast into form ; but, on the contrary, was kept by the writer, unpublished as his will, for more than five years, whence a change of intention was inferable; such change was also actually shewn to have taken place? not only by the existence of a posterior unfinished and repugnant will, made four years after, but by very many cfeclarations of the testator; and indeed the deplorable state of insanity, into which one of the principal legatees had fallen, (who was also very opulent,) made it highly improper, (and it was often so declared by the testator,) that the first will should remain in force. Besides; this will was found loose in his office, among many unimportant and official papers, whereas the unfinished will was found in his private bureau. Under these circumstances, it seems to me, I confess, highly improper, that that paper should have been established: and yet it was established, (on appeal,) by the delegates ; thus manifesting, in a remarkable degree, (and that at a modern period, (in 1798,) the overruling liberality of the English Courts, in favour of testamentary dispositions of chattels. It is true a commission of review was granted, as to this decision; but I am not informed, by the books, what ultimately became of the case. It is true also, that the Chancellor, in giving his opinion for granting the commission of review, delivered sentiments rather less liberal touching the subject, than those which had prevailed in the Court of Delegates. Every thing he said, however, is to be referred to the actual case depending before him; and the principal grounds of his dissent from the judgment in question were, the place where the *516 paper was found, and the other circumstances before inenti°ned? shewing, that this, at the time of the death of the testator, “ was no will, but only a projet of a will; that It “ was not a complete definite rule and law for settling his “fortune.” This case,, therefore, is entirely misconceived, when it is supposed to obstruct the probate of the paper now in question.
Roberts on Frauds has been cited to shew that greater strictness is now required in relation to informal wills, than formerly. I am not acquainted with the merit of this work, but will join issue in recurring to his authority. In p. 453. he says, (as his opinion of the modern doctrine on this subject,) “ that it is not every scrap of paper that a man “ writes in contemplation of death that will be received as “ testamentary, but it must appear, (and that from the paper “ itself and not from extrinsic evidence,) that the writer “ intended it to operate as it stood, when written, without “ contemplating any further act to be done to give it per- “ fection and full authenticity; and this intention every “ such paper, if it contains dispositions of personal estate, “ prospectively to the decease of the party, will be held to “ import, unless by its mode of expression or manner of “ execution, it discloses a suspended intention in the party “ framing it.”
Applying this doctrine to the case in hand, the paper before us is in itself complete as to the interests thereby embraced ; and it is only by extrinsic evidence that it is shewn, not that the testator meant to vary his dispositions of these Interests, but that he intended to dispose also of other and additional interests.
In 9 Ves. 244. Coles v. Trecothick, although the point came only collaterally before the Court, the doctrine is also recognized, that, to sustain the objection of the incompleteness of a will, it must appear upon the face of the will that something more was intended to be done.
With respect to the distinction between a will unfinished •as to a particular disposition, and one finished as to such *517 disposition, but incomplete as to, or not embracing, other subjects of interest, Swinb. 519. is full up to the point. He says, that “ when a testator, after he has begun his will, “ doth put off or defer finishing thereof until another time, “ and in the mean time dieth, See. yet,, concerning those “ things already disposed, the testament is not void by our “ law, but, otherwise, by die rigour of the civil law; and u that much less is that testament void where the testator, K having declared his whole will, and intending to do no “ more at present-, reserveth somewhat to be done at ano- “ ther time, and in the mean time dieth; for that, even by “ the civil law, in this case the testament is perfect.” The last branch of this position finds an entire correspondence in the actual case depending before us.
The same writer says, (p. 522.) that, where a draught of a will is found in the testator’s hand-writing, though not signed nor delivered before witnesses, if it seems perfect, AS IF IT DOES NOT BREAK OFF IN THE MIDDLE OF A SENTENCE, &c. and if it is found among papers of value, &c. (and, I presume, where delivered to a confidential friend,) by these circumstances the paper seems to be rather a testament than a draught only. This doctrine applies fully to the case before us; except as to the identity of the paper; a circumstance believed to have been already shewn to be entirely unimportant.
With respect to the draught of the will, now stated to be lost, I decide nothing. As to the case before us, that paper is entirely in nubibus. Whenever it, or any other will or codicil, (even the rough copy of the release intended to be executed,) shall be legally set up, or exhibited for probate, the proper tribunal will determine upon its effect and validity. All I need say at present respecting it, (and in this I am justified by the testimony delivered in this case,) is, that if it differs not from the paper in question, it is no revocation of it, but merely a duplicate or republication ; and therefore shall not obstruct its probate. And this also is the case, if it were, even proved to be different, *518 unless the particulars of the diversity were set out, so that the Court might see that it amounted to a revocation. In Swinb. 525. it is said, that a second testament does not re-, voke a former one, when it doth not dissent therefrom, but agreeable therewith in all points: and in Harwood v. Goodright, Cowp. 93. (a very strong case upon this subject,) it is said by the Court, inter alia, “ that, properly “ speaking, another will cannot exist without there being a “ difference, because, if it be exactly the same, it is no more “ than a duplicate or republication of the first willit is also held, in the same case, that if the other and different will be found to have been executed, but the Jury do not find wherein the difference consists, the Court cannot infer a revocation of the former will. As to the effect of this second (and lost) will, considered as a duplicate or republication of the former, if it should ever appear and be established, the only difference, with reference to the paper now in .question, would be, that it would be construed to speak with regard to the property held at the date of the republication.(a) The effect of the republication of a devise of lands might be important; (I speak now without reference to the alteration by our act upon this subject; see Rev. Code, 1 vol. 160. see also the case of Harrison v. Allen, 3 Call, 289. upon the construction thereof;) as it might pass lands purchased after the date of the former will, which, without such republication, would not have passed; the principle being that a devise of lands is an appointment to a particular devisee, and is considered as a conveyance ; “ whereas, as to personal estate, the law of England has “ adopted the rules of the Roman testament, which was an “ institution of an heir Cowp. 90. Harwood v. Goodright; and, in this view of the case, it would seem that the will republished would have an equal and co-extensive effect, as to chattels, with that by which such republication was effected.
I have thus considered this case, as it were, in a double aspect: 1st. Upon the idea that the draught of the will., *519 supposed to be lost, had never received the testator’s sanetion, or legally become his will; and 2dly. On the ground that it had, and was now before us, being such, and only such, as it is proved by the witnesses to have been. In the first view, the case is very clear for this codicil: and, in the last, the result is not changed; for, upon the testimony, that draught, agreeing substantially, if not literally, with the paper before us, is not another will, and operates no revocation of this will. I have already said, that if it should hereafter appear, and be found different from this codicil, nothing done by us, in relation to the latter, can affect or impair its operation.
I conclude by expressing it as my opinion, that the judgment of the District Court ought to be reversed, and that of the County Court affirmed.
Judge Fleming.
The sole question before the Court is, whether the paper in the hand-writing of John Cogbill, which was by the County Court of Chesterfield., admitted, and ordered to be recorded, as a codicil., to his will, and rejected by the District Court of Richmond, ought now to be established as such.
In considering this question it may not be amiss to take a short retrospective view of the situation, circumstances and connexions of the testator, previous to the time of his writing the paper in controversy.
It appears, that being possessed of a considerable estate, both real and personal, and having neither wife nor child, but several nephews and nieces, descendants of his brothers, Jesse Cogbill, and George Cogbill, he, on the 9th of November, 1805, duly made and published his last will and testament, written with his own hand, which has been admitted to record, and is now before this Court : in which will he manifested a great partiality for the children of his deceased brother Jesse Cogbill, by giving them the whole of his estate, chargeable only with the payment of his debts. A few months after the date of this will, his *520 favourite nephew, Thomas Nelson Cogbill (to whom he haá given specifically, the greater part of his estate, and made him his residuary legatee and one of his executors,) depaxtec^ this life? leaving a widow, Sally Cogbill, and an only daughter, named Sally Nelson Cogbill.
Upon this unfortunate event in the family, the testator thought it expedient to make another will; and for that purpose, gave verbal instructions to his friend James Ferguson, (whom he requested to write the will) with respect to the alterations to be made, in consequence of the death of his favourite nephew ; which instructions Ferguson, in the course of his testimony, said he immediately committed to writing; which writing was produced by him on his second examination, and is now in Court, with an indorsement on the back of it, “ to prepare a rc- “ lease from John Cogbill to the heirs of Jesse Cogbill, for a the amount of the within deed of trust, and in the will to “ be written, omit the whole clause respecting the deed “ trust. Ask Mr. Gregory in what manner the said release “ ought to be made.”
This memorandum is supposed to have been taken from one on the back of a deed of trust (in the course of the evidence called a mortgage) from Jesse Cogbill, to secure a debt due from him to the testator. Some time after Ferguson had committed to writing the oral instructions of John Cogbill (but how long after does not appear) the latter (about seven or eight months before his death) put into the hands of Ferguson his will, executed before the death of Thomas N. Cogbill, together with the paper, now the subject of controversy ; and requested him to prepare a will from the two papers ; which Ferguson says he accordingly did, and presented it to the testator, who after twice reading, approved of it, but postponed publishing it as his will, until he should execute a release, to exonerate the estate of his deceased brother, Jesse Cogbill, from the effect of the said mortgage, or deed of trust..
This part of the evidence is corroborated by the testimony of Edward Archer ; but it seems that the writing s* *521 prepared and approved by John Cogbill as his last will, though never executed is now lost, and cannot be produred j which brings me to the consideration of the paper now in contest between the parties ; in doing which I shall view it, first, as a paper found in the house of the testator at the time of his death, or in possession of his friend, stand? ing alone on its own authenticity ; and, secondly, with the evidence that has been adduced in explanation and support of it ; in doing which, however, I cannot lose sight of the original will of the testator, nor of the motives that induced him to alter it, it has been already noticed that the deceased Thomas Nelson Cogbill was his greatest favourite, his principal legatee, and had been appointed one of his executors : it is natural to suppose then, that upon his death the testator must have contemplated an alteration of his will : it is natural to suppose too, tha|: the family of his deceased nephew and friend, would be the primary objects of his bounty : we accordingly find by the paper in contro? versy, written wholly with the testator’s own hand, that he lent to the widow of Thomas Nelson Cogbill, so long as she should remain his widow, the land, negroes, and almost the whole of the estate, before specifically devised to him in fee ; with the remainder of the land and negroes, so lent, to her daughter, Salley Nelson Cogbill, by her deceased husband, Thomas Nelson Cogbill, to her and her heirs forever, and in default of issue of her body lawfully begotten, the said estate to be equally divided between Salley Cogbill, her mother, and his niece, Salley Hill., daughter of his deceased brother, Jesse Cogbill, and sister of Thomas Nelson Cogbill deceased, to them and their heirs forever. And what gives the greater validity to this paper, in my mind, is, that it is written in technical language, and concludes with the following words : “ Lastly, I do nominate “ and appoint Capt. Charles Graves, Armistead Bill, and “ executors of this my last will.” &c.
Those two men, Charles Graves, and Armistead Hill, are executors named in the will that has been admitted to re- ' *522 cord; and Thomas N. Cogbill was a third executor named in that will, but- he being- dead, a blank was left for the name of another in his stead, if the testator should think proper to fill it up.
It is laid down in 2 Blackstone’s Commentaries, 501, 2. that a testament of chattels, written in the testator’s own hand, though it has neither his name nor seal to it, nor witnesses present at its publication, is good, provided sufficient proof can be had that it is his hand-writing ; and though written in another man’s hand, and never signed by the testator, yet if proved to be according to his instructions and approved by him, it hath been held a good testament of the personal estate.
A written will when it is written with the testator’s own hand proves itself, and therefore needs not the help of witnesses to prove it ; for if a man’s will be found written fair and perfect with his own hand, after his death, although it be not subscribed with his name or sealed with his seal, or have any witnesses to it, if it be known or can be proved to be his hand, it is held to be a good testament, and a sufficient proof of itself. 5 Bac. Abr. 518. and Swinburne, part 4. sect. 28. and part 7. sect. 13. cited. But since the stat. of the 29th of Charles II. and our act of Assembly, it would be good only as to personal estate.
From these authorities, and many more that might be cited, and from the peculiar circumstances of the case before us, I have no doubt but the paper in question, standing on its own authenticity, without the aid of oral testimony, is sufficient as a codicil to pass all the personal estate' it embraces.
Having shewn, I conceive, that this paper, standing aloné is of sufficient efficacy, as a codicil, to pass the personal estate therein mentioned ; let us see whether there has been any evidence adduced to destroy or impair its validity.
Thé only witnesses examined in this Court (except those to prove the hand-writing of the testator) were James *523 Ferguson, Edward Archer, and Archibald FFCrae. The testimony of Ferguson has been already noticed so far as it went to prove, that the paper in question, together with the former will of John Cogbill (which since his death has been admitted to record) was by the testator, about 7 or 8 months before his death, put into the witness’s hands with a request, that he would prepare a will from the two papers, which he accordingly did, and some time after presented it to the testator, who approved of it, but postponed executing it as his will,' until he should execute a release of a mortgage he had, on part of the estate of his brother, Jesse Cogbill, deceased.
There appears in the paper in question, an erasure of several lines, which the witness said was done by the testator himself: the words erased, or attempted to have been erased, however, still remain legible, and are as follow : “ together with all my outstanding debts, and all “ and every remainder of my estate, both real and personal “ of every kind whatsoever.” Although those words still appear legible, they are so far erased as to convince ms that the testator intended to strike them out of the pap er.
The witness also said, that after the papers were delivered to him, he interlined, or added two words, to make a sentence more perfect and grammatical ; but that he had since the death of the testator, erased those words so inter - lined or added ; and that the paper now remains precisely as it was, when delivered to him by the testator ; and that in writing the will approved of, but not published by the testator, he inserted the words, verbatim, as they now stand on the paper in controversy. That he had, at the request of the testator, written a release of the mortgage, which he shewed him ; he approved of it and desired him to copy it, which he did, and the testator sent to him for it. That he was at John Cogbill's when he was dying, took possession of the papers, and delivered them to Edward Archer, from whom he again received them and delivered them to Archibald AFCrae, as counsel for the appellants, who exhibited them in Chesterfield Court.
*524 The witness, On being interrogated by Mr. Hay, further said, that a few days before the testator’s death, he received a verbal message from him, to go and sfee him, and understood froin the messenger, that it was tb write a codicil to his will, but before he went to his house, he was too far spent to do any business. The witness said something further, but spoke so low and indistinctly that I, hearing but iinperfectly, could not understand what he siiid.
The testimony of Edward Archer is the same in substance as that of Ferguson, so far as it i-espects the testator’s approving the will that had beeñ written by the latter, and his postponing the publishing it, until after the release- should have been executed ; and also with respfect to what happened at the testator’s house, about the time of his death ; and the putting the will and other papers into the hands of Mr. M‘Crae ; who says that he received them as counsel for the appellants, from the hands of Mr. Ferguson, and exhibited them to the County Court of Chesterfield; but what became of the paper, prepared by Ferguson as the will of the testator, does not appear from any of the-testimony.
That paper being lost then, and it being in evidence that it was written in the very words of the paper iri controversy, as it now appears before the Court, and as when delivered to Ferguson by the testator, who approved of the draft taken from it, word for word ; and postponed executing it only on account of a release of thé mortgage not having been signed, it seems to me that the paper now before us ought to be admitted as a codicil to the testator’s will ; because it was deliberately prepared by himself, and written wholly with his own hand : But great stress was laid in the argumént, on the circumstance of Ferguson’s having received á message from the testator, a few days before his death, to write a codicil to his will. To this objection a sufficient answer may be given from Swinburne, 519, 20. where it is laid down that, although there may be imperfection of will respecting the whole testament, because the testator cannot finish the whole according to his *525 purpose ; yet in respect of that which is done there is no imperfection of will (the perfect is not to be hurt by the imperfect.) And although testators whilst their wills and testaments are in making do, many times, add and diminish, and alter divers things ; yet who is able to say, that concerning this or that particular legacy already given, the testator would have made any addition, diminution or alteration.
If this reasoning be sound, on general principles, how much more forcibly does it apply in the present case, where the whole of the paper appears in the testator’s own handwriting. I am of opinion, upon the whole, that the judgment of the District Court ia erroneous, and ought to he reversed, and that of the County Court affirmed.
By a majority of the Court, the judgment of the District Court was reversed, and that of the County Court affirmed ; whereby the memorandum was established as a good codicil of personal estate.

 2 Bl. Com. 501.

 Ib. 499.

 See Cowp. 90. Harwood v. Goodright.

 2 Bl. Com. 501.

 Cowp. 132. Heylin v. Herlin.